# ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**FILED**

FEB - 3 2012

U.S. COURT OF
FEDERAL CLAIMS

APPTRICITY CORPORATION,

        Plaintiff,

        v.

THE UNITED STATES OF AMERICA,

        Defendant.

Case No. **12 - 80 C**

## COMPLAINT

1.      The United States has infringed the copyrights of Plaintiff Apptricity Corporation
("Apptricity") by copying and installing Apptricity software on thousands of servers and other
computing devices for which it had not purchased licenses.  Apptricity agreed to license its
software to the United State Army for use in the Army's Transportation Coordinators –
Automated Information for Movements Systems II ("TC-AIMS II") program, a Major Defense
Information System.  The Army purchased licenses to install and use Apptricity software on a
limited number of servers and other computing devices.  The Army purchased other licenses
allowing use of the software by a limited number of individuals.  However, without informing
Apptricity, the Army also copied and installed Apptricity software over a period of years onto
thousands of servers and other computing devices for which it had not purchased licenses.  The
Army has never paid Apptricity for this unlicensed copying of Apptricity software, even though
the Army eventually acknowledged that it copied and installed Apptricity software onto far more
devices than those for which it had paid.  This unauthorized copying and installation infringed
Apptricity's copyrights in its software and caused significant injury to Apptricity.  Apptricity is

entitled to recover not less than $224 million in damages for that injury and for the violation of its intellectual property rights according to prices established by contract.

## PARTIES

2.     Plaintiff Apptricity Corporation, a Delaware corporation with its headquarters in Irving, Texas, develops and sells computer software for and provides associated maintenance, support and other professional services to commercial and government customers.

3.     Defendant is the United States of America, including but not limited to the United States Department of the Army; the Army's Product Director, Transportation Information Systems; the Army's Program Executive Office for Enterprise Information Systems; and the Army Corps of Engineers' Engineer Research and Development Center (hereafter the "Army" or the "Government").

## JURISDICTION

4.     The Court has jurisdiction over this civil action as it arises under the Copyright Laws of the United States, in particular 28 U.S.C. § 1498(b), which is implicated "whenever the copyright in any work protected under the copyright laws of the United States [is] infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government." Section 1498(b) also provides that "the exclusive action which may be brought for" such infringement "shall be an action by the copyright owner against the United States in the Court of Federal Claims."

## FACTS

*A.     Apptricity's Initial Agreement with the Government*

5.      Founded in 1999, Apptricity provides web-based enterprise software applications and services to commercial and government customers for supply chain logistics, finance, and workforce management.

6.      On information and belief, in or around 1999, the Department of Defense established its TC-AIMS II program.  TC-AIMS II is an information technology system that assists military transportation agents and deploying units with global deployment, redeployment, and sustained activities.  TC-AIMS II provides commanders in-transit information during movement operations.

7.      Throughout the period in which the events described herein occurred, the TC-AIMS II program has been managed by the Army's Program Executive Office, Enterprise Information Systems, and its Product Director, Transportation Information Systems ("PD TIS"), which was formerly known as the Program Manager, Transportation Information Systems.

8.      The Army executed the TC-AIMS II program in three separate "blocks".  On information and belief, in April 2004, the Army designated Computer Sciences Corporation ("CSC") as the prime contractor to implement Block 3 of the program.  Block 3 was designed to provide the Department of Defense with the Joint Reception, Staging, Onward Movement and Integration capability needed to move goods, equipment and personnel from ports of debarkation and staging areas to forward tactical areas of operation.  In November 2004, based on the recommendation of CSC, the Army selected Apptricity to provide its commercial off-the-shelf (COTS) supply chain software for Block 3 as a subcontractor to CSC.

9.      Apptricity charged a license fee for every installation of its software.  Apptricity included this requirement in its subcontract with CSC and in all relevant subsequent contracts between Apptricity and the Government.  Since all TC-AIMS II products included Apptricity software, the Government was required to purchase an Apptricity license for every TC-AIMS II product installation.

10.      After significant arm's-length negotiations in 2004, Apptricity offered CSC, acting on behalf of the Army, the following software license prices:

- $1,350,000 for each server license installation of Apptricity software which allowed users to log in and access the TC-AIMS II application from anywhere via the Internet, and the use of that server by up to 25,000 user connections ("Server License");

- $5,000 for each client device license of Apptricity software, scaling down to $3,070.63 per device if the aggregate volume exceeded 3,000 devices ("Device License"); and

- $1,000 for each separate named user client license of Apptricity software, scaling down to $614.30 per named user if the aggregate volume exceeded 3,000 named users ("Named User License").

These prices were substantially discounted compared to Apptricity's standard commercial prices.

11.      During these initial negotiations, CSC and the Army chose to license Apptricity software under the Server License and Named User License models.  Thus, the Army was required to purchase a separate license for each server on which the software was installed and for each individual using the Apptricity software on stand-alone client devices.

12.      Apptricity also agreed to provide CSC, for the benefit of the Army, annual maintenance and support at the following discount rates: (i) 17 percent of the license price for each Server License; (ii) 15 percent of the license price for each Device License; and (ii) 12 percent of the license price for each Named User License.

- 4 -

13.     The negotiated license agreement expressly limited the Army's use of the purchased

licenses:

> The undersigned licensee acknowledges that it is entitled to use the Apptricity
> System on the conditions herein and only in the quantities set out in Schedule A
> described herein . . ., 2.2 Server License. **Licensee is permitted to access or
> otherwise utilize the Software and Enterprise Data on the number of Servers
> specified in Schedule A** in the US. The Server License includes the license to
> use the Apptricity Product Modules. 2.3 User Licenses. **Users, up to the
> number of User Licenses set out in Schedule A, may utilize the software on a
> computer or work station** capable of assessing or otherwise utilizing a licensed
> server in the US . . . (emphasis added).

14.     Schedule A of the license agreement expressly set out the purchased quantities,

describing the scope of each Server License as covering up to 25,000 users connections and the

scope of each Named User License as covering a single named user. Schedule A also contained

the prices for these licenses and the prices for annual maintenance and support associated with

these licenses.

15.     In November 2004 and November 2005, the Army procured through CSC three Server

Licenses at $1,350,000 each and 500 Named User Licenses at $1,000 each for a total price of

$4,550,000, plus associated annual maintenance and support.

     *B.*    *The Government's Further Purchases of Apptricity's Software*

16.     The Government's use of Apptricity software in the TC-AIMS II program successfully

fulfilled its requirements and expectations. In March 2007, the Army informed Apptricity that it

was not exercising its upcoming option to extend performance of the CSC contract but would

procure additional Apptricity software and professional services directly from Apptricity.

17.     In May 2007, Apptricity began selling its software and other intellectual property to the

Government on General Services Administration ("GSA") Schedule 70. Apptricity included the

Server License and associated maintenance and support on its GSA Schedule 70 contract, so

federal customers could directly procure these licenses and annual maintenance and support. The GSA Schedule price for the Server License was the same price that Apptricity charged CSC in 2004.

18.     From July 2009 through August 2011, the Army procured from Apptricity two additional Server Licenses, 150 Device Licenses, and 1,000 additional Named User Licenses, plus the associated annual maintenance and support, under Apptricity's GSA Schedule contract.

       C.      *The Government's Unlicensed Installation and Use of Apptricity Software*

19.     Apptricity employees typically install and configure Apptricity software applications for the company's customers. However, in November 2004, CSC, on behalf of the Army, required that the system installation process be modified in a way that precluded Apptricity employees from participating in the software installation process. This change in the installation process made it possible for the Army to copy and install unauthorized copies of Apptricity software without Apptricity's knowledge.

20.     On information and belief, in or around early 2008, the Army began installing Apptricity software on numerous enterprise servers and devices that materially exceeded the number allowed under the licenses it had procured from Apptricity. These over-installations numbered in the thousands. The Army also failed to pay for Apptricity's annual maintenance and support to upgrade and update the unlicensed Apptricity software installed on these servers and devices.

21.     On information and belief, the Army continued to field Block 3 servers and devices with Apptricity software installed without purchasing the required licenses until at least Fiscal Year 2011.

D.     *Apptricity's Discovery of the Government's Infringement*

22.     The Army did not notify or otherwise advise Apptricity that it was installing and using

Apptricity software on far more servers and devices than permitted under its paid licenses until

June 2011.

23.     In March 2009, Apptricity inadvertently learned that the Army may have been using

more Apptricity software than that for which it had procured licenses. Apptricity employees

attended a PD TIS Strategic Capabilities Planning meeting held March 3-5, 2009 in Richmond,

Virginia, where the U.S. Army Program Director stated that the Army was deploying thousands

of devices with the Apptricity software.

24.     On December 30, 2009, Apptricity formally sent a letter to the Army requesting that it

reconcile the number of software installations that had been made versus the number of licenses

it had procured from Apptricity. Apptricity asked the Government to disclose the number of

additional licenses that would be required to cover the user base that the Army had actually

installed. In the alternative, if the Government were not able to count the number of installations

promptly and precisely, Apptricity requested information that would make it possible to estimate

the number of Apptricity software installations, and therefore the number of additional licenses

required.

25.     From December 2009 to June 2011, the Army failed to provide the information regarding

the number of software installations as required in Apptricity's letter, actively concealing the

Army's misappropriation of Apptricity software.

26.     In February 2011, Apptricity discovered that, during Fiscal Year 2010 if not earlier, the

Army had engaged another contractor, Future Research Corporation of Huntsville, Alabama, to

reverse engineer a portion of Apptricity's software application suite and proprietary framework

architecture to replace certain infringed intellectual property rather than pay for the license

shortfall.  Apptricity discovered this effort not because the Army admitted the infringement, but

because information the Army provided to Apptricity contained a reverse engineered application

using Apptricity's backend database scheme.

27.     In a meeting on June 1, 2011 – eighteen months after Apptricity sent the December 30,

2009 inquiry letter – the Army finally admitted to Apptricity that it had installed software on

significantly more servers and devices than those for which it had paid licenses.  At the meeting,

the Government provided a report to Apptricity disclosing the installation of Apptricity software

on 12 servers, 8,805 workstations and 40 "server/workstations."  Although the June 1 report

expressly admitted the Army's improper use of Apptricity's intellectual property, it materially

understated the full extent of the Army's installation and use of Apptricity software in excess of

the number of paid licenses.

28.     In an email on June 24, 2011, the Army transmitted several documents to Apptricity that

confirmed widespread installation and use of Apptricity software in excess of the number of paid

licenses.

29.     The June 24, 2011 disclosure stated that PD TIS had conducted a *partial* inventory on

October 5, 2010, and had concluded that Apptricity software resided on at least 69 servers or

workstations (predominately servers) located at seven separate facilities.  The disclosure stated

that this inventory had been updated on March 18, 2011 to reflect that Apptricity software had

been installed on 47 – not 69 – servers or workstations.

30.     The June 24, 2011 disclosure also stated that on November 9, 2010, PD TIS had provided

a report to a Government investigator reviewing the Army's possible violation of the Anti-

Deficiency Act.  This inventory report contains a chart that revealed a significant excess of

Apptricity software installations beyond the number of licenses held. The chart showed that the Army had installed Apptricity software on 10,951 stand-alone devices and 207 servers. On information and belief, the total shortfall of Device Licenses on this chart was understated because it incorrectly included 1,500 Named User Licenses as Device Licenses. The Army did not procure its 150 Device Licenses until January 2011, several months after this November 2011 disclosure date.

31.     The June 24, 2011 email to Apptricity also provided a June 2011 chart detailing quarterly installation and use of Apptricity software between 2008 and 2011. This chart showed that the Army had used Apptricity software on 93 servers in excess of Server Licenses held and 8,913 devices in excess of Device Licenses held. The Government did not explain why the number of installations in this chart differed from the number of installations shown on the chart included in the November 9, 2010 report.

32.     The October 2010, November 2010, and March 2011 inventories discussed above were all conducted several months after Apptricity's December 30, 2009 formal request that PD TIS disclose the number of software installations actually in use. The Government failed to disclose the information revealed by these inventories to Apptricity until June 2011.

33.     Overall, under the contracts and subcontracts identified above, the Government had paid for and held a maximum of 5 server licenses, 150 device licenses, and 1,500 named user licenses for Apptricity software at the time of the June 24, 2011 disclosure.

34.     On information and belief, the Government installed Apptricity software in at least 98 servers and 9,063 devices, resulting in at least 93 unpaid Server Licenses and 8,913 unpaid Device Licenses and associated uncompensated maintenance and support per license.

35.     Apptricity has applied to register the copyright for its Apptricity Supply Chain Management suite software with the Registrar of Copyrights and is awaiting registration of its application.

## CAUSE OF ACTION

### Copyright Infringement in Violation of 28 U.S.C. § 1498(b)

36.     Apptricity incorporates by reference all the allegations set forth in the preceding paragraphs 5 through 35.

37.     At a substantial investment of time, effort, and expense, Apptricity created, developed, tested, and marketed its software, initially to commercial customers and more recently to federal agencies.  Apptricity software consists of computer programs that are original works of authorship, expressed in words, numbers, and/or other verbal or numerical symbols or indicia. Among other things, Apptricity's software includes commercial off-the-shelf software that supports supply chain logistics.

38.     The Copyright Act of 1976, as amended, protects "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(a).  Works of authorship include "literary works," which are defined as "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia." *Id.* § 101.  Such protected works include computer software.

39.     Unauthorized copying and distribution of a copyrighted work violates a copyright owner's exclusive rights to "reproduce the copyrighted work in copies" and to "to distribute copies . . . of the copyrighted work to the public." *Id.* § 106.

40.     As the author of its software, Apptricity owns the copyright in these works.  Apptricity

and the Government agreed that Apptricity would charge a license fee for every installation of its

COTS software as well as associated annual maintenance and support.  The Government

purchased licenses for the installation of Apptricity software on a maximum of 5 servers, 150

stand-alone devices, and for the use of this software by 1,500 named users.

41.     However, since about 2008, the Government has copied and installed Apptricity software

on at least 98 servers and at least 9,063 devices.  On information and belief, the Government

continues to use Apptricity software without the required licenses.

42.     The Government actively concealed its infringement from Apptricity.

43.     Apptricity first became aware of the Government's infringement in March 2009.  The

Government did not acknowledge the infringement until June 2011.

44.     As discussed above, in communications and submissions, the Government has

acknowledged having installed Apptricity software on far more servers and devices than those

for which it had paid licenses.

45.     The Government knew or should have known that it was required to obtain a license for

copying Apptricity software onto each of the servers and devices that had Apptricity software

installed.  The Government nonetheless failed to obtain these licenses.

46.     By copying, installing, and using Apptricity software without paying the required license

fees, the Government has willfully infringed, and on information and belief continues to willfully

infringe, Apptricity's exclusive rights under the Copyright Act.  In so doing, the Government has

violated 28 U.S.C. § 1498(b).

47.     As a consequence of the foregoing infringement, Apptricity has suffered, and continues

to suffer, substantial injury to its business and to its ownership rights in its software.  Under 28

U.S.C. § 1498(b), Apptricity is entitled to recover damages for the infringements described herein.

WHEREFORE, Apptricity prays for the following relief:

First, judgment against the Government awarding to Apptricity damages, including but not limited to lost profits, unpaid fees, development costs, all losses resulting from the infringement of Apptricity's intellectual property, and/or all damages available under the United States Copyright Law and other applicable law, in an amount not less than $224,543,420.80 (the minimum value of unpaid licenses according to contract license pricing, maintenance and support pricing, and unpaid work, minus offsetting credits), exclusive of pre-judgment interest, post-judgment interest, costs, and fees; and

Second, such further relief as the Court deems just and proper.

Respectfully Submitted,

*Attorneys for Plaintiff*

D. Joe Smith
*Counsel of Record*
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: joe.smith@wilmerhale.com

*Of Counsel*
Todd R. Steggerda
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: todd.steggerda@wilmerhale.com

*Counsel for Apptricity Corporation*

Dated: February 3, 2012